The last case on the docket today is agenda number 13, number 129471. The Arlington Heights Police Pension Fund at all versus JB Pritzker at all. Council for the appellant. Are you prepared to proceed? I apologize for walking in late. My name is Daniel Kondosek and I represent the appellants in this case. We're also the plaintiffs. The plaintiffs in this case include policemen and firemen throughout the state. The case that we have brought is to seek the unconstitutionality of Public Act 101, 610, and it affected, in essence, for the police under Section 3 and for the firemen under Section 4, four particular statutes. The one is that it terminated the right of a five-person board for the police and a five-person board for the firemen to control and manage what they have been since pre-1970 Constitution protection clause, pre-1970 the right to control and manage their own pensions. The act went further. It transferred all of these municipalities, the firemen and the policemen, so you're talking about 650 across the state, it took their pensions, or at least attempted in certain cases, some voluntarily turned over their assets, others haven't until this court rules, took their assets and transferred them to what's called the new fund. So for the police there's a new fund and for the firemen there's a new fund under this Public Act 101, 610. In addition, what it did is for both, again, for the police and the fire, it set up a new board for each that would now control the pensions, the assets of these 650 municipalities of police and firemen. They set up a new board of nine members who could be elected statewide, whereas before it was the local firemen, the local policemen who had a vote and a say in what happened in the control and management of these assets. We brought the constitutional argument and the one, I guess, that really focuses here is on the pension clause that prevents the state, the legislature, from doing exactly what it did in this case. Under the pension and retirement rights, under Section 5, Article 13 of the Constitution, again, going back to 1970, it says membership in any pension or retirement system of the state, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable, contractual relationship, the benefits of which shall not be diminished or impaired. So we took the position in this case is that the right to vote for each of these people, whether they're a participant, meaning that the policemen and the firemen are active, or whether they're beneficiary because they've retired. When it was local, and there was no dispute about this in terms of a couple of the plaintiffs, Joukowsky and Delaney, there was no dispute. In the case of Joukowsky, he had a 1 in 22 vote. That's how much his vote counted, 1 out of 22 people. Delaney was 1 out of 28. That's how much their vote counted. The court, the trial court in this case, Judge Villa, described it accurately, said it's not only the percentage or the weight of their vote, but in terms, and we can think about this reasonably in our experience in life, not just the weight of the vote, but the people in these local communities that they were voting for in order to manage their hard-earned assets. They knew. Counsel, to the bottom line, what benefits are you arguing were impaired? The right to vote? The weight? And it's important because it says diminished or impaired. So it did not take away the right, but it... How was it impaired? Because whereas before, as I said, they had a 1 out of 22 in the case of Joukowsky, a 1 out of 28 of voting for the person. Once it went into the new fund and the new board was created, their vote was completely diluted. Now it turned into 1 out of 11,803 and 1 out of 13,000, whatever the final number was. It completely and undeniably diluted their ability to put people on a five-person board that they knew versus these new boards of people that are statewide and they don't know. How does that impact whether or not they get a check at the end of the month or on the 19th of the month? Right. So that's the argument that's made is does benefit only relate to whether they get a check? I mean, that's the position taken by the trial judge and by the appellate court and by the defendant in this case. It doesn't, but the benefits that have been defined and the courts, as they've looked at the term benefits under Section 5, have, as recently as the Williamson case, described it absolutely broadly. But if you go back, each case, all roads lead to Kurnerva in this case. I hope I'm pronouncing it right, Kurnerva 2014, Justice Tyson. If I'm pronouncing it wrong, I apologize. That 2014 decision completely broadened, or at least for the first time, took into account how broad should Section 5 be read. In Kurnerva, if you remember, the issue there was the state had been contributing, not under the pension clause, the state had been contributing retirement benefits. I'm sorry, not retirement, but health care benefits. Not under the pension clause, but on a completely separate state statute. And they ceased doing that in the Kurnerva case. Kurnerva brought the constitutional challenge, even though it wasn't under the pension clause, they brought the constitutional challenge under Section 5, Article 13. And the defense was, well, Section 5, Article 13 only applies if it involves the pension code, because the code creates the contract. But Counsel, isn't it accurate that even in Kurnerva, we were talking about something that impacted the financial benefit? It reduced the financial benefit. It was about money. It absolutely was about money, but not voting. But the only way in Kurnerva, Justice, the only way in Kurnerva that you could implicate Section 5 would be to do exactly what the court did there. It said, we have to look at what the Constitution required. And what it did was, it said anything attendant to, not the pension code, the Kurnerva decision went beyond the pension code in order to reach a decision because it had to. So it said anything attendant to the membership in a state retirement system. It said any benefit attendant to, that flows from, that's the... What was the amount of the check the pensioner was going to get? I mean, you talk about Williamson. Williamson was about eligibility, not about anything else. It was more in that same realm, eligibility to be able to get a check once a month when you retire. So can you help us kind of figure out where your argument about these voting rights fit? We know there are the early cases, McNamee and Sklodowsky, that said the benefit language in the Constitution is not about how the fund is, where the money comes from in the fund that ultimately is going to pay out the benefit. And so they said that's not constitutionally protected. And then we have the whole series of cases that talk about what is protected. Things like health care, disability, life insurance, survivor annuity, eligibility, all of those kind of things. So you have those kind of cases that say a benefit means eventually what does the monthly check look like. And we have those early cases that say it doesn't mean what happens in the fund. How is your argument that voting rights are more like the check that comes once a month and not like those early cases talking about the fund itself? So let's talk about Sklodowsky and the McNamee. So Sklodowsky, if you remember, they sought a mandamus saying we need money to appropriate funds, comptroller, to make sure we can balance these pensions. So that case seeking mandamus really has nothing to do with the issues that are here. So that was a mandamus saying fund. That may be the procedural difference. But the idea, the court said that the health of the fund is not a constitutionally protected benefit. That's right. So what they say is that you have an absolute obligation to pay whether or not the fund is funded. Under the constitution, a benefit, not a money benefit, it's a benefit. But I want to follow up because I want to answer your question. So this isn't the case about funding justice. It's not. It's about a right that is independent and what I'm calling the voting right, not diluting it. So the issue is, then the second part of your question, the other cases that focus, the Conerva, the Budell, the Williamson, and the others. True. Absolutely. They all focus on a money issue. So I can't, I'm not debating that. So then the question you asked me is then how can we extrapolate that to the voting right? And this is my answer. What you're asking me about is precedent. Right? That's what the trial judge, Judge Gilla, he took us to the edge. He said, well, benefits should be defined broadly, but precedent says it's never gone beyond money benefits. So I went back and I looked, okay, what does precedent mean? There's factual precedent, right? Think about sidewalks. We have precedent that comes from this court, whatever it is, an inch and a half. Okay, somehow we've decided an inch and a half if you trip over it, that's factual precedent. But there's logical precedent. There's a complete difference between using our logic and reason to extrapolate from precedent. And I said at the beginning. Why is it logical to put this voting rights idea in with the money benefit check coming and not, why isn't it logical to look at this idea about voting rights, about who makes investment decisions in the fund, and say logically that's more similar to Sklodowsky and McNamee? Because it has nothing to do with appropriating monies. If you look at the cases on funding, they all focus on appropriation. Does it come from the taxpayer? Does it come from the salary of the worker? That's what the funding under Section 125 as it relates to the police focuses on. So going back to my logical extrapolation, if you and Kenerva said this benefit, we're not even taking from the pension code, we're taking it because under this broad spectrum of benefit, it qualifies or fits within that logic and reason. So you say, Dan, well, where is there a case that has voting? And I say, this is the first time in history of the pension code and the Constitution that the government has ever gone in and taken the assets of the policemen and the firemen in these 650 municipalities across the state. So I say there can be no factual precedent because it's never happened before. And that's why we're here, I suppose, because at a certain point you set precedent. That's, I guess, in essence, the job of this court at certain times is that it steps in where something factually hasn't occurred, but logically it has. Well, so from the standpoint of logic, if you say that the benefit can't be diminished, you're going to get your check regardless of where the money comes from. And yet you say that your clients want to be able to vote, to, you know, invest that money the way they want to with their five members, and if that flops, the state still has to pay. So doesn't the state have, you know, some objective, right, to come in and say, we understand we have this obligation to make sure these payments are timely made in full, and that also gives us then some obligation to make sure that the funds are all solid and that there are enough funds to pay these benefits. No, Justice, that notion has been categorically rejected by this court over and over. If you go to the In Re Pension litigation case, and I'm going to go from my memory here, the exigencies of the state of the pensions cannot be used as an excuse for the legislature to overrule a constitutional protection. Right, that you can't receive less money. The money, you're entitled to get it no matter where it comes from. Yes, that's the whole, the pension clause only says you have to pay. You are entitled to a benefit. Okay. So, counsel, are you saying the court, the state has no interest in making sure that those benefits are provided for in an orderly way? For example, just bear with me for a hypothetical. If the, by putting all these funds together, it's clear that they're able to obtain a stable and improved return on their investment. You're saying that the state has no interest in doing that, and if they allow these 650 funds to do whatever they want in general, and even if they lose money, they're still constitutionally required to do that? Is that what you're saying? Yes, there is no, there is, that section five, the argument or the position you've just stated has been the, one of the hallmark arguments every time one of these cases come up. They call it the exigencies. I am not talking about exigency at all. I specifically didn't use that word. I am not talking about exigent circumstances at all. Nowhere in my hypothetical do I contemplate exigent circumstances. I'm talking about orderly administration of the funds so that what is constitutionally required and guaranteed can be consistently given to the beneficiaries. That's what I'm talking about. Right, and so the last part where you talk about can be consistently given, and that's, I won't use the term exigency. No, because I'm not using that term. So we'll call it efficacy. You can call it whatever you want. No, but that's what, so we're talking about efficacy, that the state can be more efficient. That's also been rejected categorically, that the state can somehow do it better. That's the in-rate litigation pension funds. That's been focused on in the Carmichael case and the others, that the efficacy of some other better plan does not qualify the state or give the state, whether we call it under police powers or whatever we want to call it, to come in and violate the constitutional protection under Section 5 of Article 13. So either, whether we call it, whatever we want to name it, efficacy, they can do it better, whatever it is, they can get better returns. That's not my argument because that's a factual issue that is not governed by Section 5, Article 13 of the Constitution. It's a simple analysis in terms of if it's a benefit, you can't touch it. Can I get, last thing, just from Kenerva. Counsel, if you could, your time has run out. Please bring your remarks to a close. It's just that now. Thank you. Okay. Counsel? which transfers the custody of the assets and the investment management functions of the assets of these Article 3 and Article 4 funds to two newly created investment management entities. I would like to clarify at the outset certain facts just to make sure we're all talking about the same situation before turning to the main issue, which I believe is the pension protection clause challenged by these individual plaintiffs. And I'd like to clarify what the Act does and does not do. It transfers the investment management authority of these assets to these two new entities for the Article 3 and 4 funds, which are all the police and firefighter funds outside of Chicago. It does not combine all of these 650-odd local funds into two giant funds. All those local funds stay as they always have been. They all have their own assets. They're all administered by their own boards, which are elected in the same way that they have always been elected. It maintains separate accounts for each of these local funds. And it prohibits the use of any assets of any of the funds for the expenses or disbursements of any other fund. It does not reduce by a penny the payments made to any of the members of any of these funds. It doesn't change the formulas for these local boards to determine the amount of those payments. It expressly preserves the authority of those local boards to make those determinations, such as, is this member now disabled? Was it a work-related disability? How do we apply the formula to determine the amount of that disability payment or the retirement annuity? Those types of things. The purpose of the Act was to reduce by tens of millions of dollars each year unnecessary administrative fees, including for however many hundred separate investment advisors. And it was also intended to streamline investing so that with consolidated investments, there would, over the long term, be higher returns, lowering the burden on local municipal taxpayers. It was passed with broad bipartisan support, supported by the Fraternal Order of Police, the Independent Firefighters of Illinois, the Metropolitan Association of Police, and by the Illinois Municipal League. And that's the purpose. I understand you're kind of laying the foundation for us, but all those factors that you're talking about, is that something we should consider in making our decision? Well, the plaintiffs have said that the wisdom of the law really is in question, and they argue also that the wisdom of the law is irrelevant. And I'm not sure which of those they really want to pursue, but our position is they were right at least to say the wisdom of the law is irrelevant, but to clarify that this is something where it's not a win-lose, where somebody wins and somebody loses. This is a situation in which essentially nobody loses. None of the members lose a penny of their benefits, and that's why it got this broad support, but it is a win for all of these funds as a whole because it will, or is intended to, increase their assets and reduce tax burdens on local taxpayers. But the constitutionality of the issue does not turn upon who voted for it and whether it in fact achieves, or to the extent to which it achieves, its purpose of increasing the asset values for all these local funds. And we are not trying to argue that its constitutionality depends upon, you know, whether it's successful in that regard or how wise it was. So the central issue in this case turns upon the Pension Protection Clause challenge to this statute and its transfer of this investment management authority to these two newly created funds. And the plaintiffs allege that it violates their rights under the Pension Protection Clause, which protects against any diminution in pension plan benefits because it supposedly diminishes their voting rights and it supposedly uses their local fund assets for the startup transition costs and implementation of the act. And our position is that the court should reject that claim because they're essentially asking the court to overrule 50 years of its own precedent that defines very clearly what benefits are that are protected by the clause and what is not protected by the clause. And it would replace a very sensible and workable criteria for implementing the Pension Protection Clause, which is does it reduce the amount of the check that any member gets. With this unworkable criterion, which is, well, anything in the Pension Code that changes local boards, powers, or authorities. And there are dozens of those changes since 1970. They're all over the map. And it would essentially replace that simple workable criterion with an unworkable one, with no limiting principle, and open up a giant can of worms, which is calling into question the constitutionality of scores of changes to the Pension Code that have affected local boards, authority, or many things, including specifically the management of pension fund assets. An example quickly is that the law a number of years ago required pension funds to hire investment of certain pension funds, local pension funds, to hire investment advisors. Well, that would be unconstitutional because somebody would consider it a benefit not to have investment advisors and not to incur those expenses and to have the local board members themselves make those decisions. There's no stopping point for where they want to go with this case. So let me turn to, it's unusual in an argument in this court to talk extensively about the meaning of the court's own precedent. But in this case, I think that's necessary to resolve this case. The plaintiffs have said, essentially, that McNamee didn't say what it said, that it has nothing to do with defining what are benefits and what are not benefits protected by the pension clause. And, by the way, even if it said that, that was old rule by Canerva. We fundamentally disagree. In McNamee, the statute that was challenged was one that reduced the contributions to Article III pension funds. The plaintiffs challenged the validity of that. They wanted more contributions to their pension funds. They said it was unconstitutional. They said higher contributions and higher asset levels is a constitutionally protected benefit that the legislature can't change. And this court said, no, it is not a benefit. The only thing that the clause protects is the member's right to receive their benefits. And since then, the court has repeated that in the Sklodowsky case, in the Jones case, in the Matthews case, making clear each time with examples that the receipt of benefits means the examples that Chief Justice Tice just gave. Retirement annuities, disability benefits, health care subsidies, that was the Canerva case and the like. And so that was the rationale for the case. That was the holding of the case. And the plaintiffs have not been able to articulate any logical distinction between that holding and what they're arguing for here, which is essentially only something that affects the assets in their local funds and has no effect upon the payments that they would receive. And the court has, in other instances, said and held that the clause does not protect the sources of funding for such payments, which is essentially what we have here. Not only did the court use that rationale in the McNamee case, but it also followed that rationale in the Sklodowsky case and, again, in the Jones case, where the defendant government was saying, we're going to increase contributions. That's a benefit that we can't change. And this court said, no, no, that's not a benefit. Benefits are what the members receive, essentially their payments, their checks. It would be unusual for the court, as the plaintiffs argue, to have silently overruled 50 years of precedent in the Canerva case or the Carmichael case or the Williamson County case, as the plaintiffs essentially maintain. And it would be especially surprising if the court never said that anything justified overruling that precedent. The court has strict standards for overruling its precedent. The precedent has to be unworkable or badly reasoned. There was no discussion of that, much less an ability to satisfy those standards. And further, after the Canerva case, the court has continued to approvingly cite its holdings in McNamee and Sklodowsky and Jones, even including in the Carmichael case and the Williamson County case. So plaintiffs are left with this argument that, well, taken out of context, the language in Canerva and Carmichael and Williamson County suggests that a benefit can be anything. And we think a benefit can be a nonfinancial benefit. And, therefore, the clause extends to all nonfinancial benefits. That does disservice to the process for interpreting the court's holdings and the process for interpreting statutes in the Constitution, which is things have to be read in context. Words can't be taken in isolation, pulled apart, looked at, find some dictionary definition of the outer boundaries of what's possible, and then jam it back in and say that's what was meant. And I think the best example here is the holding in the Carmichael case where the court says the Pension Protection Clause protects every type of pension benefit, and then it gave us specific examples, retirement annuities, disability benefits, health insurance subsidies. And I think that's sort of the principle of justum generis, which is when you use a list of examples, that essentially defines the type of category or classification that you were talking about. It just strikes us as extremely unusual to say that the court silently overruled this clear precedent that's been there for the past five decades without saying anything about it. And remember that this precedent is built upon the core purpose of the clause, which the court has repeatedly recognized. And that purpose is to make sure that the benefits that are promised to public employees while they are employed and while they're contributing to these systems do not get taken away from them, that nobody pulls the rug out from any of them. And the court has repeatedly applied that principle. It is every time the legislature has tried to reduce benefit payments, the court has struck it down, struck that down. And every time that the legislation has done something else with the administration of pension benefits that didn't affect those payments, the court has upheld it. The plaintiffs can't identify a single incident in which the court has struck down a statute that didn't affect benefit payments or that it used the word benefits to apply to something other than benefit payments. And I want to say that pension plan benefits, the term benefits, in that context has an extremely well-established meaning. And so when the drafters proposed this to the 1970 Constitution, when the voters voted on it, they voted on the question, which is whether the Constitution protects pension plan benefits. And the term benefits in the pension code before 1970 always meant the payment of benefits. The drafters of the clause at the 1970 Constitution made it clear that that's exactly and only what it protected. And if you ask the average person on the street what they understand by pension plan benefits, you know what the answer is going to be. It's how much money you get at the end of the day in your retirement or your disability. So I don't want to belabor the court's precedent. I think the court can read the cases as well or better than anyone. But I do want to say that this is not an appropriate vehicle for the court to all of a sudden say, oh, we were wrong for 50 years, and now we understand that the term benefits in the clause means something completely different than what we've said for this period of time. The ramifications of the plaintiff's argument are also very unsettling. And I'm going to turn to the voting rights argument, which seems to be their main theory here. They are essentially saying that their voting rights have been diminished. And I want to clarify, they still vote as they always did for the same people, and the only thing that has changed is the power of local boards to invest their funds' assets, which are now in the custody and investment management of these two entities. So the voting rights didn't change. What changed was the local board's power to engage in investment. So that's not really a voting rights theory per se. This would be a different case if, in fact, the legislature said local members can no longer vote for their local boards who decide the amount of their annuities or disability benefits. This is a case where the operative fact is that the local boards no longer have the same authority they used to have. But what's the limiting principle for any changes in local boards' authorities that don't affect benefit payments? The plaintiffs have offered none. The court has asked, what's the distinction between that and the laws that change the contributions to the systems? What's the logical distinction between those two? And there does not appear to be one. And if you go down the road of saying that every time there's been a change in the pension code that affected local boards' authority, there are dozens of them, including changes that affect their ability to invest assets. Somebody might say, I don't want to invest in stocks. I think it's a benefit to stay in very safe bonds. Even though my payments, the payments to me, are guaranteed no matter what, I would rather have higher security in our local fund assets by investing only in fixed income. There are economists that would say that. Then there were people who would say, I don't want to have investment advisors paid out of our funds. All of those changes. For years, there was a prohibition upon investments in companies that had major activities in South Africa. Was that unconstitutional? It didn't affect by a penny the benefit payments that the members of these systems received. So the voting rights theory, essentially when you look at it closely, isn't really so much about voting rights. It's about the power of local boards, and that has changed repeatedly. And if court wants to basically create chaos in the pension code and call into question all these changes that have been implemented over the years, then that's the court's prerogative, but we urge the court not to do so because that would be inconsistent with the plain meaning of the clause, its understood purpose, 50 years of this court's precedent, and the practical consequences of what would happen if it did that. I could turn to the plaintiff's argument about the supposed use of what they say are their assets to be for these new entities, and I just want to clarify, and I think we said this in our briefs. Their rights are to receive benefit payments. They don't own the assets in these funds. This is not a defined contribution plan, like an IRA or a 401k, where you make your contributions, those are your assets. You have an account that lists what's in your retirement account, and those are your assets. These are defined benefit plans, and cases have repeatedly held that with respect to public defined benefit plans, the members don't own the assets in the fund. And the appellate court also pointed out this case was decided on summary judgment, and the plaintiffs never introduced evidence that there was going to be any higher expenditure of assets in these funds than under the old system, where they had investment advisors and all the rest and incurring all sorts of expenses. So just as a matter of burden of proof, the plaintiffs didn't prove that there was any additional use of their assets compared to what it used to be. But the core principle there is they don't have a constitutionally protected right to control the assets in their local funds. They have a constitutionally protected right to receive the benefits promised to them, and the court has said that's an ironclad guarantee that this act does not touch, unless the court has any questions about the takings clause or any aspect of the pension clause claim, we urge the court to affirm the lower court's judgment. Thank you very much. Thank you. Federal counsel. Thank you. The argument that we are asking you to overrule 50 years of precedent is incorrect and flat out wrong. In Kenerva, what I was going to say before my time ran up, the exact same arguments that are raised by counsel were raised in Kenerva. In Kenerva, this court said rather the drafters chose expansive language that goes beyond annuities, which we all know what pensions are, annuities. It says it goes beyond annuities and the terms of the pension code, that's how it allowed the subsidy of the non-pension code health insurance to be paid, and saying trying to take it away is unconstitutional. And then it said defining the range of protected benefits broadly to encompass, and here's the language that was used in Kenerva, those attendant to membership in the state's retirement system. To encompass those benefits broadly to those attendant to membership in the state's retirement systems. It is indisputable that the people had a local vote. They could vote in or vote out participants. They could vote in or vote out beneficiaries. They could vote in or vote out who the mayor appointed. That is a right that gave them the possibility to say we don't like the way things are going and we have a right to say, you know, put an end to it by the power of a vote. I want to be really clear about what your argument is about what benefit has been diminished. Now, your friend and colleague here has argued that there has not been a dilution of voting rights, that the individual still, members still have an opportunity to vote for their local boards, that the only change is the authority of the local boards in deciding investment strategies. Is that correct? No, it's absolutely wrong. 22B and 22C set up an entire new board consisting of nine members. Do the local members continue to vote for the local leaders of the fund? For local leaders to do one thing. That's my question. Do the members still have a vote as to the local board members? They do. Okay. So that's not, when you argued before there was a dilution because now a vote before was 1% or whatever it was and now it's diminished. So they still have a right to vote for the local board, correct? Local board, they have a right to vote, but they do not have the same power for the larger boards that now control the investments. So now, so again, let's be real clear. What is the benefit that has been diminished? That they know the member and members no longer have a vote as to who makes the investment strategy decisions. Is that right? Is that specifically the benefit that you're talking about? That was given by the, yes, by Section 128 and 132 of the budget. We've got to write an opinion. And somewhere in this opinion it's going to, in one little paragraph, it's going to say, counsel argues the benefit that's diminished is. So that's what I'm looking for. What is the language there? It's diminished because it took what was a local decision on what you've described as their own investment advisors, et cetera. And it gave that power to a board over which they have almost zero right to say because their voting rights have been diluted. It's as simple as that. That's our argument. Can I, the argument that we're overruling precedent. You in Kenerva, and I just read to you from paragraph 42 of your opinion that said that it's this broad, expansive language because it's attendance to the membership, which in any membership there's always a voting process and a right to vote, a hierarchy, which is absolute truth in most memberships. But you in Kenerva at paragraph 42 took the same argument where they listed the same cases and said, oh, but we have Bedell. Oh, but we have McNamee. Oh, but we have Sklodowsky. And those say you can't do what you're doing here. You specifically said none of those cases involve the question of whether certain benefits attended to membership in a state system are covered by the protections guaranteed by Article 13, Section 5. Same thing here. There is no factual precedent. I'm not asking anybody to overrule. I'm asking you to follow your precedent. Logically, there has never been a case like this before, period. So we have to go to the next step and say there's no factual similarity. Logically, is the benefit of the right to vote, that right to vote when it's diminished, have they lost the benefit? Benefit is defined not in the code. It is not defined in the code. And benefit means advantage. If I have the benefit of hindsight, there is nothing monetarily connected to that. To read into it monetary is not what the precedent that this court has set going back to the Constitutional Article 13, Section 5 cases that derive from this. The last thing I want to say is in Kenerva because I believe Kenerva controls the decision here. This court specifically said that going to those Constitutional debates that he wants to rely on, this court said those debates were absolutely confusing and led to nothing that the court could rely on in making decisions. So we're left again with the simple proposition that this court said in Kenerva is that you cannot affect the funding, which this is not dealing with. The right to vote does not affect funding. It affects a benefit. A benefit. Thank you so much for your time. Thank you very much, both sides, for this spirited argument. This case, Agenda Number 13, Number 129471, the Arlington Heights Police Pension Fund et al. versus Governor J.B. Pritzker will be taken under advisory.